Mr. Mercer. Thank you. Good morning. May it please the court. Steve Mercer for Gloria Taylor. This case involves trial counsel's ineffective assistance by failing to file a suppression motion based on the DEA's use of administrative subpoenas to collect Ms. Taylor's cell phone location information that revealed her wholesale movements over time. Now, re-polled data, which is at issue in this case, is information that Ms. Taylor had both a subjective and legitimate expectation of privacy in. And there's really three main reasons why. Why are we, just to set the context, focusing on the re-polled data as opposed to the entire warrant and the basis of it? What's the basis of that? Why are we here with just the re-polled data as being the matter that's on certification to us? So, the reason why is that when the subpoenas issued for Ms. Taylor's cell phone information, that was in 2014. January of 2014 at JA 955 is the subpoena. And under 2703C, well, let me step back for a minute. The Stored Communication Act really functions in a tiered system. And so a subpoena can be used to obtain basic subscriber information without notice to the subscriber. The subpoena can. But if content or information akin to content is to be obtained from the carrier, the government must use an order under 2703D. And so, to fast forward a little bit, in the relevant procedural context here, Gram 1 had been decided, which held that a subscriber holds a legitimate expectation of privacy. The Fourth Amendment applies to cell site location information. And that was being obtained under a 2703D order less than... Wait, Gram 1 had been decided when? Gram 1 was decided... Decided in 2015? Yes. And when was the subpoena? The subpoenas were in 2014. Okay. When I say relevant procedural context, I mean while this case was pending, so about eight months before trial, Gram 1 had been decided. And so Gram 1, of course, ultimately affirmed the conviction under the Leon Goodfaith exception, because even though the 2703D orders there predated Gram, you know, it held that the Fourth Amendment applied to this type of information. So assuming the Fourth Amendment applies to repo data information, when Gram 1 wasn't issued until 2015, why doesn't the Goodfaith exception apply to this case as well, since the subpoena was in 2014? For three reasons. What are the three reasons? There is no third-party wrongdoing. So here the officers erred. The officers didn't ask for repo data in their subpoena, did they? No, they did not specifically mention repo data. At the same time, however, under the SCA, Stored Communications Act 2702, the carrier cannot voluntarily provide information to the government. So that's your number one, the third-party violation. Yes, that the agents erred because a subpoena was used that triggered their coming into receipt of this information, the repo data, which we maintain cannot be obtained by subpoena. And you're saying the agents knew that the subpoena they used, even though they didn't ask for repo data in that subpoena, would have triggered the receipt of repo data. How did they know that? Well, a couple reasons why. Number one, they knew that because they used it as such, right? When they got the repo data, they used that location information in the application, a later application for a 2703D order for the cell site location information. So they obviously had experience with that data because they used it. And given the volume that law enforcement collects of cell site data in general, I mean, we cited to one publication that indicated well north of a million in a particular year request for cell site data. So if Sprint is doing this on a regular basis, which it appears to be the case, a well-trained officer would recognize that. Well, the subpoena didn't just ask for subscriber information. It asked for telephone connection records in the 2703C. Yes. So how did they err by asking for those telephone connection records as provided by statute? And they can ask for the connection records. We don't dispute that. The error here is that what they received from Sprint was location information. And that location information is more akin to content than to connection records. Connection records would be the originating number and the number being called. Because otherwise, and this is certainly true as of 2014 and well before that, sort of rewinding to what the issues were that were in play at that time, it was really between was a 2703D order required to obtain location information or was a probable cause warrant required? Well, you've got the 2703 statute there that talks about the connection records. What you have here is repolling data. It basically is a phone switch. It tells you how you connect a call. How is that not connection records? Well, it's no more or less connection records than cell site location tower information. And still... Far less specific, isn't it? When a cell phone tower pings you, you're in that location. This data here, what does it tell you? You're in a state or you're in a general area or somewhere? Your Honor, it absolutely is less precise. But as Carpenter made clear and I believe as Graham One also made clear, it's not just precision, it's quantity. And so we have here a vast quantity of data. Over 382 days of data, repolled data, were obtained by a series of three subpoenas. In Graham, it was 221 days of data. Carpenter was 127 days and Jones was 28 days of data. That's not repolling data in Carpenter and Graham. To be fair, that's correct. Obviously... Big difference in the CSLI type stuff that they can compare to repolling. Jones was GPS, of course. Carpenter addressed the argument that, well, this is less precise. And, of course, we're talking about sectors, not precision information like GPS. But here, and really drilling down even further, Your Honor... What is it telling you? What is this repolling? Every time I do one of these cases, I learn a new term. What's a repolling data? I'm thinking, is it like a switchboard in the old days where they plug in those plugs up there? What is that? I think the best analogy is it's the brain for a group of towers. And so if we're going to protect the specific tower that a cell phone is connecting to, we also have to protect the brain that regulates that group of towers in a region. So how general is the region? How big is this region you're talking about? Well, it varies, of course. New York City may have, if you go through the repoll index, there may be three switches. If you go out to... The entire city of New York City? Well, Long Island, that sort of area. So you would know a person is in Long Island. You would know they're in Manhattan. You might know they're somewhere on the other side. Yes. So density... That's all you would know. Yes, density. But here's the important thing, though, Your Honor. What you know is when there's movement. And it's not just location that we're concerned about in this context, but it's location coupled with movement. So you could know one day he's in Long Island, next day he might be in Arizona. Correct. And it's encyclopedic in the sense that, and the government raises this point, well, airline records. But a cell phone is always attached to a person. So it's like in the push of one button, the government can get... It's like a GPS, only in a broader sense. I'm sorry, Your Honor? It's like a GPS attached to us all the time, only in a broader sense. Absolutely. And that's what's so unique about the cell phone and why it's encyclopedic. It's not like you're just guessing what airline the person may be on and getting those records. This is... There's a big difference. GPS tells you you're moving while it's going on. You're just rolling out. This doesn't tell you that. It tells you, boom, you're here. Then you make another call, you're there. But it doesn't tell you while the call is going on that there's movement going on. I'm not suggesting that while a call is moving on, a call is ongoing. It's not even close to GPS. What I'm suggesting, Your Honor... GPS is something that scared the Supreme Court so much, they didn't want you to put that on a car. It went home. So what is your most succinct argument that the use of this repo data is an invasion of a reasonable expectation of privacy? Because of what it can reveal about a person. Okay, and what? And what it can reveal... A person's interstate travels and travels within a state between major cities or locations can reveal an awful lot about the person. So, for example, if someone lives on the West Coast in California and they're a member of a political organization with perhaps extreme views that has a meeting in Michigan, and you see the data from the switch indicating Michigan, and then you see data from Washington, D.C. on, say, January 5th or January 6th, that is going to reveal a lot of information about that person. Well, tell me this. If you get on a car in New York City and you drive to North Carolina, you're going to hit a few where you won't get many tolls in North Carolina, but before then you're going to hit a lot of tolls. Can the government subpoena those toll records from each one of those booths that do basically the same thing you just said is happening here? Yes, I believe they could, but think of the... What's the difference? Well, the effort involved and the practical limitations, right? So if the government doesn't know how someone is traveling, they would have to get records for all the different easy pass or like toll records for vehicles. They'd have to get train records, bus records, and every single airline. You know, here all that's involved is literally a fax, a push of a button to a carrier with an administrative subpoena, right? So the ease of getting the information is important, even though ultimately the result would be the same. Yes, I think one of the factors that... It's too easy for the government to get it this way as opposed to that toll booth, which is the same thing. You come through there, that toll booth is lighting up. It knows you've come through there. Well, there's an easy pass. That's an easy pass. They know they have it, but they can get there. Right, yes. But you're saying it can't get there. The repolling data that you made a call in New York, then you made one in Delaware, then you made one in Virginia. Right. And that's all you got. And that's because of the unique nature of a cell phone and how it's attached to us, and that the government at one touch of a button, there's no practical limitations to gathering all of that data that reveals a person's interstate movements and movements between major cities. And there's other scenarios that we can think of, particularly in a post-dobbs world, for example, too, where there may be interstate travel between a pro-life and a pro-choice state that may be of interest to law enforcement. And, again, at the push of a button, send a fax, the next day they get the person's what is supposed to just be basic. You're not getting us into that argument today. But let me ask you this, because it is interesting. That toll thing kind of troubled me a little bit, because when I think about it, and I think about Coppola, I think about Graham. I actually just sent it in the Graham case, but it gave it back to Coppola to get it back somewhere in there. And I think the court is still struggling as to what to do with these technological advances. But this one in particular, because of this fragmented way in which it's given it, and you say ease is the way to do it. That sounds good, but no one else has ever said that ease is a factor in determining these kind of cases. I think Justice Scalia discussed it in Jones, Your Honor, because there's the reality of trying to follow someone, right, the police conducting surveillance. And when police do surveillance, and I just had a hearing where it was all about. . . So, again, we're talking about, you're talking about a GPS that you attach to a car and follow it around and around and know every last place that person goes. That's a different ballgame than a camera that's picking up from one street to the next street. It would be like the camera is following you. You put it behind it. You just have the camera going behind it. That's a different thing. Well, here's the point I was hoping to make, is that if it's just a question of police manpower, to surveil someone takes a lot of manpower, right? So there's a practical safeguard right there against the government overreaching, because if they do a surveillance, they need eight or nine officers to be following someone 24-7 and switching cars so they don't get spotted. They're just not going to do that on a widespread basis. But I think one of the themes that has always emerged when we talk about technology and surveillance is that those practical limitations are gone. And now the government, with very little effort, can obtain enormous amounts of data, which it then filters through with its software program. And then uses to obtain a search warrant. And then uses to obtain additional information. For example, the 2703D order here, and then the GPS orders, and then ultimately the search warrant for the residents. And I have a red light flashing. I just want to ask you just a question, because I thought that's what Judge Wynn was asking you while we were just here on the poll, repo. But the fact that they went into her yard and with a dog without a warrant, that's not here at all. I mean, is that just eschewed by the defense that that wasn't? I'm just wondering. Yeah, that is not within the question. Oh, I know. I know. That's why I said it may be just a housekeeping question. It may be accounted to jurors' curiosity. Why is it not here? Why is that gone? Why is that gone? I mean, they didn't have a warrant. All of that stuff, you just went to the house without a warrant and put a dog in her yard and alert, and then they get a warrant to search the truck. I think it's even more so than the yard. The dog went into the garage. Exactly. Even more so. That's my point. Why is it not here? Well, because it was raised, and Judge Schwong in the district court considered that that motion would have some merit under Grueninger, but that there was a good faith exception that applied under Collins because Collins v. Virginia, which, you know, addressed the police entry to examine a motorcycle, you know, under a sort of a shed, an outdoor shed attached to the house, had been decided. So there was a good faith issue that Judge Schwong, I would anticipate. I thought good faith came with warrants. I'm sorry? I thought you applied for a warrant, and it turns out that it's defective. Well, yes. A warrantless search gets good faith if it's wrong. I would anticipate that if we're successful and we obtain a remand, that we're going to continue to press that issue because we don't believe that the ‑‑ That issue may be ‑‑ I don't know. But anyway, go ahead. That's all. So I'll reserve any balance of my time for rebuttal. Thank you, Your Honor. Thank you. Mr. Sarma? Thank you, Your Honors. And may it please the court, Christopher Sarma on behalf of the United States. The government would ask that the judgment here be affirmed. Trial counsel provided effective representation of counsel. In 2014, when law enforcement officers obtained this repo data through an administrative subpoena, they did so legally or at minimum, as Judge Stacker pointed out, in good faith. And even if the district court had ruled that the use of repo data should have been suppressed, there's not a reasonable probability that the outcome at trial would have been different. I think one thing I want to highlight at the beginning is I think there are some difficult questions potentially as to whether repo data falls within the definition of historical CSLI under Carpenter, and I'm happy to discuss those. But for the purposes of deciding this particular 2255 motion, I don't think the court has to get there because of the good faith exception and the fact that every court that seems to have addressed the question of when you've collected CSLI data prior to Carpenter, does the good faith exception apply? And every court has said, yes, it does. And I think that ends the debate here about whether or not a motion would have been meritorious. I have a separate question. Without the repo data showing that appellant used the phone in Arizona, what information in the government's 2703D established the connection between appellant and the target phone? So if you look at the 2703D, the other, which would be JA 912 to 916, and the other information was there was a tip from the Tucson DEA to the DEA in Maryland. By the time in which the suspicious package or crate, which ended up having marijuana in it, was sent from a shipping depot in Tucson to Maryland, a rental car was photographed outside the depot. That rental car was matched to a rental car that Ms. Taylor had rented. In addition, there were the Southwest travel records, and you can see a table that was used both there as well as the search warrants that showed that she was traveling to Arizona on dates in which marijuana shipments were being shipped from Arizona back to Maryland. In addition, there's evidence that when she returned to Maryland, there's evidence that she had spoken to a particular driver at R&L Carriers, Mr. Willis, and she had given him specific directions about where to deliver these packages. And so those would be the other points to place her in Arizona. The connector to the phone? That was my question. The phone in particular, the connection is there was a subpoena made to Avis to see what phone she had given to Avis when she rented the car, and that was the phone number that was identified. I think it's the 957 number. And so I, you know, just going back briefly because I want to start with the good faith exception. I think even if the court It would be nice to address the Fourth Amendment issue here because, I mean, something can come up again. I mean, it seems to me to be fundamental. I mean, we can jump right to the conclusion. I mean, the Supreme Court has done that to us in 1983 cases and other things. Just jump over the big issue and go to the Constitution and go right ahead and just resolve this and leave it hanging out there. Then come back and have to deal with it when it's more direct. Is that where you're going with it? I'm happy to. I'm always happy to have the narrowest ruling, but I'm also happy to address it right now, Your Honor. And we would submit for some of the reasons that you described in your hypotheticals. I mean, it's right there in front of us. And yeah, it may be the answer down here on good faith, but that issue is right in front of us now. How do we, I mean, but you want us to skip over. That doesn't help you on the next case. Doesn't help the defense lawyers on the next case. Wouldn't it make life a lot easier to know that answer and not have to keep bouncing that one around? We would welcome it, Your Honor, but I would say for the purposes of this particular case and this particular ineffective assistance to counsel claim, I don't think it gets there. So repo data is not CSLI, but what is your best argument that the use of repo data is not in and of itself an invasion of a reasonable expectation of privacy? I think because it falls within third party doctrine rights being voluntarily conveyed. I actually was reading. And so did the other things before they didn't in Graham one and Carpenter. So I think and I was actually reading Judge Wynn's dissent, luckily, in the en banc in Graham this morning. And he actually, I think, specifically talks kind of incidentally about the difference. Right. With CSLI, there's no voluntary conveyance. I'm holding my cell phone in my pocket. It is trying to ping for for tower records. And that's how you get all the different types of kind of pinpoints about where you're located. In order for you to get any sort of switch record or switch data associated with where you are, you need to make an outbound call. So if you actually look at the CSLI, sorry, the repo data in this case is at issue. When Miss Taylor is making an outbound call from Tucson, it's hitting a switch in Phoenix and then being routed. But if you look at calls that follow after that, that are inbound while she's still in Tucson, they actually don't go through the 449 Phoenix, which they go through the switch wherever the person making the call is located. I think that's a key difference here. So I think this is much more akin to, for example, Smith versus Maryland, where the court said you're voluntarily conveying the numbers you dial into a telephone that falls under the third party doctrine. I guess the other example would be IP addresses. The court has said several times that you're allowed to – that is a voluntary conveyance to a third party. And so you don't need to – there's no Fourth Amendment search, even after Carpenter, for IP addresses. And an IP address is much more granular in terms of its ability to locate someone than repo data is. I'm not sure it was clear in Mr. Mercer's remarks, but the repo data here showed that when she made an outbound call in Tucson, it hit a switch in Phoenix. So if we were to go to a court just on that information and said, well, we know she was in Tucson because it hit a repo – it hit a switch in Phoenix, I'm not sure any judge would have given us a search warrant. We have to have much more specific pieces of evidence linking her to Tucson itself in order to get there. I would add on the question, the meaty question the judge wouldn't – and I'm happy for the court to address it. The only case that we found, and I think both parties found it, that really gets to the nub of it is Commonwealth v. Collins, which is from the Supreme Court of Massachusetts. And I think it's a good analog. It is pre-Carpenter, but the Supreme Court of Massachusetts got there before the Supreme Court of the United States did, and they said, in a prior opinion, Commonwealth v. Augustine, that historical CSOI was indeed a search, and so therefore you need to go and get a warrant. And then Collins comes along, and they say, with repo data – and there they're talking specifically about repo data – they say, that is not the type – doesn't have the granularity to it. It doesn't invade on privacy such that it's a search within the Fourth Amendment. And so we would ask that the Fourth Circuit follow that ruling. I guess the other case we would rely on would be United States v. I think you pronounce this, Ahadis, from the Second Circuit, where they're kind of factually similar to here. There was a request via subpoena for telephone connection records. The telephone company returned information, including what they referred to as location information. I think there it was country codes, and the court said there, motion denied and judgment affirmed. I think I've not heard from the other side a case going the other way on repo data, so I'm not sure the basis to do so here, especially because I think there's several distinctions as discussed between repo data and the historical CSOI from Carpenter. So going back to my question about the 2703D order, was the repo data used in any way to obtain that order? Yes, Your Honor. So there, and this is at JA914, there was a single sentence about the repo data. It said cell phone data routing numbers show that Taylor utilized this phone in Arizona during the time frame of October 9th and 10th, 2013, and January 22nd to 25th, 2014. And you got that phone number in the first instance from subpoena, issuing a subpoena to the rental car? That's correct, Your Honor. And we would maintain, this kind of blends into the second argument that we raised in our brief, that even if you were to excise that information from the 2703D order, as well as it was used again in the phone tracking warrant, we would say we would have still been able to obtain those warrants and that D order based on all the other information that we provided that located her specifically to Tucson and that shipping depot where the packages were coming in, as well as testimony from the delivery driver about how she was instructing him about where exactly to deliver these packages to. I'm well under time, Your Honors, but I think I've gotten to the main points I want to address. Unless there are any other questions from the panel, I'm happy to rest at this point. I do have a question. I'm sorry. I just want to make sure I understand about this repo data. Did you say earlier that she made a call from Tucson, but the repo data, the number attached to it said was Phoenix? That's right. The number, the repo number that you can see is 449. That's associated, I believe it's either a Lucent or a Nortel switch located in Phoenix, because that would be the closest switch in which to route the number when she's calling someone back on the East Coast. But it doesn't tell you she's in Phoenix. It tells you she's in Arizona. I think as a technical matter, it says that when they are routing the call, the tower used would be, or the switch used was the switch located in Phoenix. I think there could be examples, and I'm not a telecom lawyer, so I apologize, where you could potentially be on the border of the state, and there could be a situation where the way the call is being routed is hitting a different switch. DC, DC, Maryland, Virginia area. Right. It could hit in a bunch of different places. Do we need to resolve the question of whether this repo data was properly obtained under that statute of 2703C to rely on the good faith exception, or is it enough for us to say the DEA relied on a reasonable interpretation of the statute? Well, I think, Your Honor, I think we would say that the statute allows, as you pointed out, for telephone connection records, this piece of information is a telephone connection record. And there's no, I'm not sure I've seen, and we were not cited to from the other side, any case law suggesting that this isn't a telephone connection record. It's a switch. Tell me a little bit more about this repolling data. When I think of the CSI, one of the big questions, one of the big differentiations seems to be, you know, one's a little less precise than the other. You're unable to do it. But if you go out into the rural areas with those, that CSLI, it's about the same thing as repolling data, isn't it? I'm not sure that's correct, Your Honor. For example, I believe there's only one switch in Hawaii. I think you would get more precise location data because there's presumably more than one tower in Hawaii. I imagine there's actually several in Honolulu, for example, or in other kind of even more remote areas of Hawaii. So if you had a, you know, I think the CSI would be more granular. I do think there is a difference, too, about the conveyance, right? The problem, I think the thing that you pointed out in the dissent and then that Chief Justice Roberts pointed out in the Carpenter Majority is with the CSLI, you're not – the only thing you're voluntarily doing is turning your phone on. And given how everyone has their cell phone on them at all times, there's really no way to avoid that. Here, you're making – she, Ms. Taylor or any other defendant, is making a choice to dial a number, right? And so that is the voluntary conveyance that's taking place. And when she makes that outbound call, she's revealing something. I think she's revealing that it hits a switch. See, Carpenter had a catch-all sort of view there. You gave me Hawaii, and I was thinking Montana. That was big in West Virginia. I'll say I clerked in Fairbanks, Alaska, so I'm well familiar with the – That's what you call a rule. So if you're talking about a cell tower being pinged in Montana and repolling that, it looked like to me it could be the same thing. And that's the question I'm asking. That was why I brought it up. It wasn't for Hawaii. Hawaii is a nice place, but I don't think it was being ruled at all. Not even West Virginia. It's some spot. I would imagine – Montana. Yeah. I imagine there's only a couple. I'd have to look back. I don't have the sprint. I'd have to look back through the sprint log, and you can do so yourself. But I imagine there are very few switches in West Virginia, or there might be one in Alaska. But there are a lot of towers, and CSLI is going to pick up all those towers. And I know Your Honor wants to address the issue head-on for purposes of future precedent. But here, as Judge Thacker has asked me about, there was a lot of other independent evidence in the record to show that she was in Tucson and she was at that shipping depot at the relevant time period. I think that's important to remember when deciding whether or not the motion just pressed would have been meritorious in this case. If there's nothing further, thank you very much, Your Honor. Thank you so much. Mr. Mercer, you have some time left. Thank you, Your Honor. I think using granularity to distinguish Fourth Amendment rights is problematic. It would result in a system where, for example, people who live in a rural area have fewer Fourth Amendment protections than someone who lives in an urban area. And that can't be right. And so it's not about granularity. Granularity is one factor. It's not just about precision. It's about quantity and ease of collection. Ultimately, we maintain that a reasonable expectation of privacy and a subjective expectation of privacy is really revealed by what the data tells about a person. And so someone, for example, who is traveling every weekend to Las Vegas, who is maybe running for office and claiming to be a family man, those frequent trips to Las Vegas may suggest something about them. Or if someone is traveling to the city where a Democratic National Convention or a Republican National Convention is held, again, that's going to reveal information about someone. And ultimately, the quantity is so important because it's patterns, right, that can emerge from travel and movement interstate and between cities. And that's what really informs subjective and legitimate expectations of privacy. And the government makes the point that, well, this is not like CSLI because it's being voluntarily conveyed when someone dials a number. Well, I would take issue with the government about CSLI. The pings occur when the phone call is connecting. And so, you know, this is the argument that was always made in the CSLI cases by the government is that there's voluntary conveyance. Somebody has to dial the phone number to then connect to the tower. But it's that connection to the tower and the significance of that data that is just invisible to the user. I mean, who knows about repo data? And so it's the lack of knowledge under CAT that that information is readily and easily available to the government at the push of a button that's so problematic. Judge Thacker, you had asked about the 2703D order at JA-912 and had, I think, focused in on the question of, you know, the 2703D order was the target of that was the 757-945-6589 number in connection with a 841 offense. And so the question is, is there specific articulable facts in the 2703D order that that target phone is being used in connection with an investigation, you know, the offense of an 841? There, as I read 912, 913 to 915, there's nothing in there about Avis. And there's no other information in there about 6589 being used in connection with the 841 offense other than at JA-914 subparagraph 3E, which, as the government had read, cell phone routing numbers showed that Taylor utilized this phone in Arizona during the timeframe of October 9th to 10th, 2013, and January 22nd to 25th, 2014. And so what that was establishing that was so critical to the 2703D order for that phone is that it was being used around the time where the government believed that there was activities occurring related to 841. And so that is what provided the basis for the 2703D order. And then once the government had the cell site location information from that order, then it was able to obtain GPS tracking orders and prospective surveillance. So I think... So it all goes back to this repo data, not a subpoena to Avis. Yes. Because it's the repo data, and this is the location, and it's the movement, right? It's the fact that she's not in Maryland. She's in Arizona with that target phone that is providing the articulable, specific, factual basis for the 2703D order. But in terms of ground information, wasn't there evidence that at the depot in Arizona, the car was located by camera? There was an indication that around, I think it was in July of 2013, that there was a vehicle that Ms. Taylor was in that was outside of the shipping depot. Right. It was a tip. It doesn't matter if it was a tip or not, but there's evidence that the car was there in the area, correct? Yes. And then when they checked the license plate of the car, they found out where it was rented from. And then from that rental agency, they found out the application or the paperwork done for the rental, correct? Right? No. That's not right? No. Go ahead. It's part right and... Tell me the part that's right. Okay. Well, the part that's right is the sequence of the investigation. But the phone number, the target phone number for the 2703D order at page J912, that phone number was initiated after that July surveillance in Arizona. Okay. Before they knew about the rental? After. That's what I said they knew about the rental before, didn't they? Am I wrong? Yes, but... Yes, I'm wrong. No, no, no. I'm sorry. What I'm expressing, Your Honor, is that the basis for the 2703D order for the 6589 number, the 6589 number didn't come into existence until after that July tip. And so my point simply being is that in terms of the basis for getting the 2703D order for that phone number, which provided the data that was then used to get the more specific GPS orders and ultimately to get the search warrant for the phone, for the home, the basis for that connection between 6589 and the 841 offense is the repo data, which showed that that phone, that phone, we're not talking just about Ms. Taylor, but that phone was being used in connection with the offense because it was traveling with her. That's the point I was trying to make. And I don't believe I made it very well. The other point I would just, my clock is going up, so I will stop there. Well, if you want a final point, Senator, about the threshold of utterance. As of 2014, the prevailing practice was that location information was obtained with 2703D orders or search warrants, not subpoenas. And so there's no cruel good faith exception because the DEA officers did not comply with the statute in this case, which includes receipt of information that the carrier could not under 2702 voluntarily provide. Thank you very much for your time, your honors. Thank you so much. And thank you both, counsel, for your arguments here today. We can't come down and greet you, but know very much that we appreciate your arguments and your assistance on the case and wish you well. Thank you very much. And I'll ask the deputy to clerk to recess the court. The court stands adjourned until tomorrow morning.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker